# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                                      Case No. 15-CR-131

**GUS KOUTROMANOS**
    **Defendant.**

## DECISION AND ORDER

The government charged defendant Gus Koutromanos with tax evasion. Defendant moved to suppress business records taken by his partner, Konstantinos Maltezos, from the restaurant they co-owned ("Omega") and later provided to the IRS by Maltezos's friend, John Bouikidis. Defendant argued that Maltezos lacked authority to take the records, and that Bouikidis and Maltezos acted as government agents in turning them over to the IRS. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be denied. Defendant objects, requiring me to review the matter de novo. See Fed. R. Crim. P. 59(b).

## I. FACTS

Neither side objects to the magistrate judge's recitation of the facts. I therefore adopt that portion of the magistrate judge's report (R. 33 at 2-10) and present an abbreviated version of events herein.

In 2005, Bouikidis sold the Dynasty Restaurant to Abigail and Norberto Rapeta. In late 2011, Bouikidis learned that the Rapetas were under investigation, and that IRS Agent David Klingbeil wanted to talk to him. Bouikidis, concerned about his own tax problems at the time,

called Klingbeil, who set up a meeting at IRS offices in January 2012. At that meeting, Klingbeil and a DEA agent asked Bouikidis about the Rapetas and the sale of Dynasty.

Bouikidis also told the agents that he had information on another person the IRS might be interested in, Paul Bouraxis; Klingbeil knew the name because the IRS was already investigating Bouraxis, although that investigation was being handled by a different agent, Zachary Stegenga. Bouraxis held a mortgage on the Omega Restaurant, owned by Bouikidis's friend, Maltezos. In April 2012, defendant was brought into the business as 50% owner and took control of Omega's financial affairs.

In June or July 2012, Bouikidis asked Maltezos to provide him with information about Omega, and Maltezos told Bouikidis that he would try to get Omega's financial records. Bouikidis told the agents that Maltezos might provide the records, but the agents did not ask him to obtain the records. Klingbeil asked Bouikidis to provide his personal business records for Dynasty, but he did not ask Bouikidis to obtain records from third parties.

In August 2012, Maltezos copied Omega's records and gave them to Bouikidis. Later that month, Bouikidis met with Klingbeil and Stegenga about the Dynasty and Bouraxis investigations, turning over the Omega paperwork he had received from Maltezos.

In April 2013, Bouikidis submitted a request to the IRS to obtain a reward for the information he had provided on Bouraxis and Omega. Bouikidis learned of the possibility of a reward from a friend, not the agents. Klingbeil testified that he never offered Bouikidis a reward or discussed with him the idea of obtaining a reward, never paid Bouikidis any money or offered him anything of value, and never threatened to charge Bouikidis or suggested that he could be charged unless he cooperated. Nor did Klingbeil ask or encourage Bouikidis to obtain Omega's records. He considered Bouikidis to be a citizen witness. Klingbeil did not

2

meet Maltezos until August 2015, three years after Bouikidis had turned over the Omega records.[1]

Agent Stegenga likewise denied that he ever asked Bouikidis to obtain Omega's records; nor did he suggest that, or try to induce Bouikidis to, obtain the records. Indeed, Stegenga testified that he was surprised when Bouikidis turned them over. Stegenga further testified that he never threatened Bouikidis with prosecution, never offered him any type of consideration to provide the records, and never paid him for his assistance; he also considered Bouikidis to be citizen a witness voluntarily providing information. Stegenga's first contact with Maltezos came in September 2012, after Bouikidis had turned over the Omega records. Stegenga testified that he never asked Maltezos to obtain Omega's records, and he considered Maltezos to also be a citizen witness voluntarily providing information.

Bouikidis testified that the agents never promised that he would not be charged with a crime if he provided information, never promised him money for his cooperation, and did not instruct him to get the records from Omega. Bouikidis further testified that he brought up Bouraxis and the Omega restaurant to the agents for his "own reasons," to "protect, to support the thing [he] started with IRS." (Evid. Hr'g Tr. [R. 28] at 45.)

Finally, Maltezos testified that he had no contact with federal agents before he gave the records to Bouikidis. No one ever threatened him with criminal prosecution or told him he would not be prosecuted if he cooperated; he was never paid anything by a federal agent for

---

[1]Klingbeil testified that at that meeting Maltezos said he was working with Bouikidis to blow the whistle on Bouraxis and had been doing so since the beginning of the investigation. Maltezos also said he had a verbal agreement with Bouikidis to split the reward for which Bouikidis had applied. However, at the evidentiary hearing, Maltezos denied having a deal with Bouikidis to share in any reward.

3

the assistance he provided in this matter; and no federal agent ever directed him to obtain the records. He said he copied the records for his "own personal reasons." (Tr. at 80.)

## II.  DISCUSSION

Purely private searches are not subject to constitutional restrictions. United States v. Feffer, 831 F.2d 734, 737 (7th Cir. 1987).

> A difficult issue arises, however, once the government is contacted by a private searcher. The government may not do, through a private individual, that which it is otherwise forbidden to do. Accordingly, if in light of all the circumstances a private party conducting a search must be regarded as an instrument or agent of the government, the fourth amendment applies to that party's actions.

Id. In deciding whether a private party acted as an "instrument or agent" of the government, the court considers whether the government knew of and acquiesced in the intrusive conduct, whether the private party's purpose in conducting the search was to assist law enforcement agents or to further his own ends, whether the private actor acted at the request of the government, and whether the government offered the private actor a reward. United States v. Shahid, 117 F.3d 322, 325 (7th Cir. 1997). The defendant bears the burden of proving that the private party was acting as an instrument or agent of the government. Id.

Defendant argues that Bouikidis and Maltezos acted as government agents when they obtained the Omega records and turned them over to the IRS. He further argues that, even if the seizure of the records did not violate the Fourth Amendment, the government needed a warrant to search them. See United States v. Aldrich, 642 F.3d 537, 542-43 (7th Cir. 2011) (addressing a similar argument). In Aldrich, the court found that the government did not need a warrant because the private party who turned over the records had authority to consent to a search. Id. at 543.

As defendant concedes, if Maltezos had authority to consent to the government's

4

acquisition and search of the Omega records, the motion must fail, even if Bouikidis and Maltezos did act as government agents. As the court explained in Aldrich, a finding that a private party acted as a government agent does not automatically direct suppression; it simply triggers a Fourth Amendment analysis. Id. If the government's warrantless search fits within an exception to the warrant requirement, such as consent, there is no Fourth Amendment violation. Id. at 543-44. Accordingly, whether Maltezos had authority to take the records and consent to the government's search of them is a dispositive issue in this case.[2]

On de novo review, I agree with the magistrate judge that Maltezos had authority to consent, and did consent, to the government's acquisition of the Omega documents. As the magistrate judge noted, the testimony varied as to how Maltezos got into the office to obtain the records. The agents testified that Bouikidis told them that Maltezos used a hidden key to get into the office, and that Bouraxis and defendant did not let Maltezos manage the restaurant anymore.[3]

---

[2]Aldrich and the cases on which it relied, United States v. Payner, 447 U.S. 727 (1980) and United States v. Basinski, 226 F.3d 829 (7th Cir. 2000), involved government searches of closed containers. Similarly, the cases defendant cited before the magistrate judge involved packages, containers, and mobile phones. In the present case, it appears that Bouikidis simply turned over a stack of papers to the IRS. Defendant cites no authority for the proposition that the agents needed a warrant to simply read the papers. See United States v. Simpson, 904 F.2d 607, 610 (11th Cir. 1990) (finding no further invasion of privacy where contents of box had already been determined by private party, even though government agents took more time and were more thorough in reviewing the contents); see also Rann v. Atchison, 689 F.3d 832, 836 (7th Cir. 2012) ("When a private party provides police with evidence obtained in the course of a private search, the police need not 'stop her or avert their eyes.'") (quoting Coolidge v. New Hampshire, 403 U.S. 443, 489 (1971)). There is no basis for concluding that the agents exceeded the scope of the previous, private search here. In any event, for the reasons stated in the text, I find that Maltezos consented to the agents' search of the papers.

[3]At the hearing, Bouikidis testified that Maltezos still had access to the Omega office at the time they discussed obtaining the records; he did not recall telling the agents Maltezos used a key to get into the office. (Tr. at 33-34.) Bouikidis did recall telling the agents, at some point,

5

However, Maltezos testified that he remained 50% owner, that he was the registered agent and had signature authority over the business bank account, that the business licenses were in his name, and that he had access to entire premises, including the office, which was secured by a combination lock; he denied using a hidden key to get into the office. Maltezos testified that the records were on a desk in the office, which he shared with defendant.

As the magistrate judge noted, Maltezos was better situated to know his business relationship with Omega than Bouikidis. Maltezos offered a detailed account of his history with the restaurant, indicating that he bought Omega from Bouraxis in 2006; his partners at that time were Daniel Bishop and Tasio Evreniadis. (Tr. at 57-58.) In 2010, Bouraxis acquired the mortgage note on the restaurant from the bank, after which Maltezos paid Bouraxis rather than the bank.[4] (Tr. at 59-60.) Maltezos subsequently brought in Gus Tourloukis as his partner. (Tr. at 60.) In April 2012, Maltezos and Tourloukis fell behind on the mortgage, and defendant was brought in as 50% owner. (Tr. at 61.) In exchange for defendant being given a 50% interest, Bouraxis released Tourloukis's collateral. (Tr. at 62.)

Maltezos admitted that Bouraxis subsequently tried to push him out. (Tr. at 63.) Bouraxis acted like he owned the business, even though on paper he did not. (Tr. at 64.) Maltezos further admitted that as of April 2012 defendant taken control of the bookkeeping, check writing, and money.[5] (Tr. at 64.) However, Maltezos denied that he no longer had any

---

that Bouraxis and defendant did not let Maltezos manage the restaurant anymore. (Tr. at 35.) Bouikidis said he stopped going to Omega in April 2012 when defendant became manager. (Tr. at 40-41.) However, Bouikidis testified that at the time Maltezos gave him the records Maltezos was still 50% owner of Omega and helped run the business. (Tr. at 44.)

[4]At that time, Maltezos also bought out his partners, Bishop and Evreniadis. (Tr. at 60.)

[5]He made a similar admission to Agent Stegenga. (Tr. at 133; Hr'g Ex. 13 at 2.)

6

control; rather, he cooperated with Bouraxis's wishes that defendant do the books. Maltezos testified that he still handled the cash-outs. (Tr. at 65.) Maltezos explained that while he had an agreement not to step on his partners' toes, "I had any control I wanted in the place. I was 50 percent partner." (Tr. at 76-77.)

In any event, even if Maltezos ceded day-to-day control of Omega's financial affairs to defendant in April 2012, it is undisputed that he remained a 50% owner. (Tr. at 78.) It is also undisputed that he remained the registered agent for the business; that he had signature authority over the business bank account (Tr. at 79); and that he controlled all of the licenses for the business (Tr. at 79) – liquor, occupancy, and food – which were in his name, not defendant's (Tr. at 80). Maltezos also consistently testified that, whatever control he may have ceded to defendant and/or Bouraxis, he continued to have access to the office and the desk from which he obtained the Omega records. (Tr. at 67-68, 70-71, 78.) Maltezos said he and defendant were 50-50 partners, and the "desk belonged to me just as much as it belonged to him." (Tr. at 71.) Defendant offered no evidence to the contrary, other than hearsay statements to the agents.[6]

In his objections, defendant argues that at the time they accepted and reviewed the records, the agents had ample reason to question Maltezos's authority based on what Bouikidis had told them. But the evidence establishes that Maltezos had <u>actual</u> authority to consent; this

---

[6] In his reply, defendant indicates that he does dispute that Maltezos was a 50% owner. But he cites no evidence of that. At best, the hearsay statements on which defendant relies show that Maltezos ceded control of Omega's financial management to defendant. The record contains no evidence that Maltezos gave up his ownership interest. As the government notes, as the co-owner of the business, defendant could have challenged Maltezos's ownership interest with his own evidence; he also could have presented evidence on whether the office lock opened by key or combination; he did not.

7

is not a case of <u>apparent</u> authority, where the only thing that matters is what the agents knew at the time of the search. See <u>United States v. Groves</u>, 470 F.3d 311, 319 (7th Cir. 2006) ("For the apparent authority analysis, the court must consider what the officers knew at the time they sought . . . consent and whether those facts were sufficient to demonstrate that the officers reasonably, but erroneously, believed that [the consenting person] possessed shared authority as an occupant."); <u>see also</u> <u>United States v. Groves</u>, 530 F.3d 506, 510 n.1 (7th Cir. 2008) (stating that facts not known by the officers at the time of the search are relevant to actual authority).

Having found that Maltezos possessed authority to consent, it is unnecessary to go further. However, for the sake of completeness, I note my further agreement with the magistrate judge's "instrument or agent" analysis.

First, while the agents may have known that Bouikidis was trying to obtain records through Maltezos, it is undisputed that they in no way encouraged him to do so. See <u>Feffer</u>, 831 F.2d at 739-40. Defendant cites no authority in support of his argument that the agents' indifference to the manner in which Bouikidis told them Maltezos got the records demonstrates acquiescence.[7]

Second, both Bouikidis and Maltezos testified that they obtained the records for reasons of their own. It appears that Bouikidis provided information, initially about Dynasty and later

---

[7]In reply, defendant cites <u>United States v. Stein</u>, 322 F. Supp. 346 (N.D. Ill. 1971) and <u>Knoll Associates, Inc. v. FTC</u>, 397 F.2d 530 (7th Cir. 1975), but those cases are distinguishable. <u>Stein</u> involved a private searcher who never claimed any legitimate access to the documents, and <u>Knoll Associates</u> involved records the court characterized as "stolen." Maltezos, by virtue of his position, had authority to obtain the records in the present case. See <u>United States v. Ziperstein</u>, 601 F.2d 281, 289-90 (7th Cir. 1979). The record does not support defendant's suggestion that the agents should have known or suspected the Omega records were stolen.

8

about Omega, because he was worried about his own tax problems.  See United States v. McAllister, 18 F.3d 1412, 1418 (7th Cir. 1994) (finding that the informant had independent motivation to receive favorable treatment on his own pending charges, even though he might also have intended to assist law enforcement in this prosecution).  It appears that Maltezos produced the records because he was upset with the way Bouraxis treated him (Tr. at 82), making him feel like "an insect" (Tr. at 65).  See United States v. Connors, 441 F.3d 527, 530 (7th Cir. 2006) (finding that the defendant's ex-wife acted out of animus, not government direction, in providing information).  Defendant argues that Bouikidis had been an informant for eight months at the time he and Maltezos obtained the records.  But "the question remains whether [Bouikidis] was acting as a government agent in this case."  McAllister, 18 F.3d at 1419.  Defendant fails to show that he was when he produced the Omega records.

Defendant does not even attempt to show that Bouikidis and Maltezos acted at the request of the government.  Instead, he skips to the final factor, noting that Bouikidis applied for a reward based on the information he obtained about Omega.  But it is undisputed that none of the agents involved in this case offered any inducement for the records.  Defendant cites no authority that an agency relationship can be formed based on a private actor's subjective expectation that he might receive a reward pursuant to a general government program.[8]  Defendant argues that the agents' decision not to pursue a case against Bouikidis amounted to a reward.  However, defendant fails to show that the agents had a basis for

---

[8]Before the magistrate judge, defendant cited United States v. Walther, 652 F.2d 788 (9th Cir. 1981), where the court found that an airline employee, who had a history as a paid DEA informant, acted as a government agent when he opened a package, even though he had not been promised a reward for this particular search.  Because Bouikidis never received money from the IRS for any of the assistance he provided, Walther is distinguishable.

9

bringing timely charges against Bouikidis, that they declined to do so based on the assistance Bouikidis provided, or that Bouikidis obtained the Omega records based on any such inducement. See Shahid, 117 F.3d at 325-26 ("A private party cannot be deemed a government agent unless it was induced to act by some government action.").

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 33) is adopted, and defendant's motion to suppress (R. 16) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 27th day of April, 2016.

/s Lynn Adelman
LYNN ADELMAN
District Judge

10

Case 2:15-cr-00131-LA    Filed 04/27/16    Page 10 of 10    Document 39